Filed 5/15/23  In re R.Y. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.Y., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080337 |
| Plaintiff and Respondent, | (Super.Ct.No. J280734) |
| v. | OPINION |
| C.H., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Kaleigh Ragon, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant, C.H. (mother), filed a Welfare and institutions Code section 388 petition,[1] which the juvenile court denied. On appeal, mother contends the court erred in denying her petition without holding an evidentiary hearing. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 5, 2019, personnel from plaintiff and respondent, the San Bernardino County Children and Family Services (the department), received a referral alleging physical abuse by mother and J.K. (boyfriend, collectively, the parents) to H.H. (born Nov. 2005), general neglect by mother to R.Y. (minor, born Feb. 2007) and H.H., emotional abuse by mother to all the children, and emotional abuse by boyfriend to P.K.[3] Boyfriend was alleged to be a chronic opioid user due to a back injury. He had stated on multiple occasions that he wanted H.H. out of the house, and that H.H. was ruining their family. The parents acknowledged that boyfriend had been trying to get H.H. arrested for the past one-and-a-half years so that H.H. would be out of the house and the parents would no longer be responsible for him.

H.H. said he was locked in his room "fulltime." He said that as part of his punishment, the parents did not send him to school. He reported sleeping on the floor

---

[1] All further statutory references are to the Welfare and Intuitions Code unless otherwise stated.

[2] By order dated December 23, 2022, we incorporated the record in *In re R.Y.*, case No. E078949, from mother's appeal of the court's order placing minor with the maternal aunt in Arizona. The case was dismissed on September 27, 2022.

[3] Boyfriend was the biological father of P.K. only. He is not a party to the appeal.

2

with a jacket and blanket. H.H. said he had no heat in his room. He reported being physically abused but would not provide examples due to fear of being punished.

On April 9, 2019, department personnel received another referral reporting that H.H. and minor were being locked in their rooms; the windows were also locked so that they could not get out. The reporting party said that H.H. stole parent's credit card; boyfriend then "choked him out." The reporting party said the parents were "hurting [H.H.] and leaving marks on him and will not send him to school because they do not want the school to see the marks." The reporting party said boyfriend "choked out" mother, possibly in front of the children.

Department personnel had previously opened a voluntary maintenance plan with the parents and the children on May 21, 2014. The court had detained the children from parents on January 12, 2015, for general neglect. The case was closed on September 30, 2016. On May 13, 2013, a court had previously terminated the parental rights of N.P., the biological father of H.H. and minor, as to three of their half siblings, and a fourth half sibling on May 5, 2014.[4]

On April 18, 2019, the social worker interviewed H.H. at school. H.H. said he did not want to get mother in trouble: "'It's my dad. My dad said if I tell I would be a ward of the state.'"[5] H.H. said he was now locked in his room all day and had only a blanket

---

[4] N.P.'s whereabouts were unknown; he never participated in the case.

[5] H.H. and minor would sometimes refer to boyfriend as their father even though he was not their biological father and the parents were not married.

for a bed. He said "'my dad hits me and chokes me out and one time I even los[t] consciousness.'" H.H. reported that "'most of the time when my dad hits me or chokes me, it is behind the door and away from the camera.'"[6] "[O]n the rare occasion when his mother ha[d] observed [boyfriend] hitting or choking him she would jump on [boyfriend] and try to stop him." The last time boyfriend choked H.H. out was approximately two months earlier.

H.H. reported that boyfriend hits him with boyfriend's fist, sometimes with one knuckle out, which would leave a lump on H.H.'s head. H.H. demonstrated how boyfriend would choke him by placing one arm around the front of his neck as in a headlock. H.H. said boyfriend also choked mother out four or five times. He said boyfriend also hit minor, but boyfriend never hit P.K. H.H. was afraid of what would happen if parents found out he had spoken with the social worker.

On April 18, 2019, the social worker went to the parents' home. Mother said she would let H.H. out of his room "'sometimes.'" She said she kept H.H. locked in his room because he had stolen her credit card information and the department did not help her with his behavioral problems. The social worker said the school, the department, the Department of Behavioral Health, and medical doctors had offered the family multiple services. The children received services at school; parents refused in-home services and had not participated in any services themselves. Mother declined medication for the children because she believed it was poison.

---

[6] The parents kept a camera facing H.H.'s bedroom door.

Mother denied boyfriend would hit H.H. She said H.H. would lie. H.H. was found in a dark, locked room with a camera facing the door. His room had dirty, stained carpeting and a single blanket. The windows appeared to be locked from the outside. Minor's room had a mat with blankets and a pillow on a concrete floor. There were no working lights in either room.

P.K.'s room "appeared considerably different as it consisted of carpeting, a box spring and mattress with blankets and pillow," furniture, and a light. P.K. said minor and H.H. would lie about parents. He reported that he had missed a lot of school.

Boyfriend had a criminal history which included corporal injury to a spouse, kidnapping, grand theft, criminal threats, and burglary. Department personnel took the children into protective custody.

On April 22, 2019, department personnel filed a section 300 juvenile dependency petition alleging, as to mother and minor, that mother knew or reasonably should have known that boyfriend was physically abusing H.H. and minor (a-1); that mother knew or reasonably should have known that boyfriend was physically abusing H.H. and minor, placing minor at risk of abuse (b-2); that mother failed to provide psychiatric care for H.H. and minor (b-3); that mother failed to provide for the children with adequate living conditions (b-4); that mother failed to provide for the children's educational needs (b-5); that mother knew or reasonably should have known that boyfriend was abusing substances placing minor at risk (b-6); and that a voluntary maintenance case had

previously been opened and closed, yet the children remained at risk of the same issues (j-9).  On April 23, 2019, the juvenile court detained the children.

In the May 10, 2019, jurisdiction and disposition report, the social worker reported she had called the parents on four occasions but was unable to leave a voicemail.  On April 30, 2019, the social worker spoke with H.H. who said mother knew boyfriend "'choked me out.'"  He said boyfriend also choked out minor twice and mother "too."  H.H. said he was not taking his medication because the parents did not feel like making appointments to take him to the doctor.  Boyfriend reported he had a back injury for which he took opiates.  The social worker noted that 51 referrals had been made on the household since June 2010.  On June 24, 2019, department personnel amended the petition to add allegations that mother and boyfriend had engaged in domestic violence in front of the children, that mother had allowed minor to be subjected to multiple acts of cruelty by boyfriend, and that mother had performed acts of cruelty to minor.

In a first addendum report filed June 25, 2019, the social worker recommended the court deny the parents reunification services pursuant to section 361.5, subdivision (b)(6) (severe physical harm to the child or a sibling).  The parents declined to be interviewed without counsel present.  The maternal uncle reported that boyfriend had held a gun to H.H.'s head when H.H. was three years old.  He reported that boyfriend had also previously held a gun to mother's head and made her get in the car and leave.  An officer had arrested boyfriend and he spent time in jail.  Boyfriend reportedly attempted to commit suicide by hanging himself in the closet.  An officer confirmed being called to

6

the home when boyfriend had tried to hang himself. Records from prior cases reflected that both minor and H.H. had been prescribed psychotropic drugs. H.H. refused to visit either mother or boyfriend.

Mother had had one supervised visit with minor. After the visit, minor refused visits with the maternal aunt.

In an evidentiary interview, H.H. reported being locked in his room for prolonged periods of time. All he had was a blanket. He slept on the ground and was cold all the time except in summer. He said he was often thirsty as he was only allotted half a cup of water a day. He said he once went five days without eating. He was only allowed to sponge bathe outside; sometimes when boyfriend was gone, mother would allow him to shower. He once went three weeks without a sponge bath or shower.

H.H. described his life as "'miserable.'" Boyfriend told him multiple times boyfriend would kill him. Boyfriend choked him to unconsciousness on multiple occasions. Boyfriend hit him multiple times in the head leaving bumps. On one occasion, he heard boyfriend choking minor. H.H. said mother told him boyfriend had choked mother. In another interview he reported he was 11 when boyfriend attempted suicide by hanging himself with a necktie. H.H. said he repeatedly tried to hang himself like boyfriend. H.H. reported that his biological father touched his penis over his clothes and touched minor's vagina over her clothing.

On July 20, 2020, department personnel filed a second amended petition to add allegations that mother failed to ensure minor's psychiatric needs due to her prior sexual

7

abuse and that mother failed to protect minor from sexual abuse. The maternal aunt, who lived in Arizona, had requested placement of H.H. and minor; the department requested placement pursuant to the Interstate Compact on the Placement of Children (ICPC).

At the hearing on July 10, 2019, counsel for the department requested that visitation "be found detrimental and suspended." P.K. was purportedly being coached by mother. After visits with minor, there were issues with her behavior. Boyfriend's counsel noted, "The parents . . . have gone months without seeing their children, which is totally inappropriate."

Mother's counsel observed, "It's my understanding that the visitation started very late in the process. I think at this point it would probably be more appropriate to admonish the parents and warn them what would happen if they continue to behave in this regard as far as visitation. It's my understanding that both kids, [minor] and [P.K.], do want to see their mother, and it was represented to me that [H.H.], when . . . Mom attempted to visit him, she was told he was not receiving any visitation from either parent. So I don't know if this report is accurate as to the—how it helps what has been going on with the attempts of visitation in this case."

The court found mother's behavior "unacceptable." "The one thing I can do is order an immediate stoppage of the visit and no further visits if there is any behavior that has occurred, such as coaching, passing notes, whispering. If that occurs, I'm giving absolute authority to the Department to stop that visit, and then not allow any further visits." However, the court ordered visitation between the children and visits between the

8

children and the parents to occur once weekly for two hours; they were to be "closely monitored."

In a September 16, 2019, additional information to the court report, the social worker noted that visits had occurred between the parents and the children. The social worker noted that mother had initially been referred for services on June 10, 2019; staff had attempted to arrange services for her on three occasions; however, mother was not yet in counseling. The social worker issued another request for services on September 9, 2019. H.H. said he did not want to go home to mother; he wanted to live with the maternal aunt.

In a November 4, 2019, addendum report, the social worker recommended minor be removed from mother and that mother not be provided reunification services. The social worker noted she had obtained the children's school records and there were significant unexcused absences. Personnel from minor's group home had given the social worker a notice to move her after an incident wherein minor struck one of the staff members saying boyfriend "'does it to her mom, so why can't she?'" Minor was placed in a behavioral health facility; personnel from the group home refused to take her back. After visits with mother, minor became "extremely aggressive[.]"

Mother was scheduled to have a visit with minor on June 30, 2019; however, it was cancelled due to minor's behavior. Mother and boyfriend visited with the children on July 10, 2019. Mother visited with minor on August 18, 2019. Minor said she liked

visiting with mother. "The mother has been engaged in setting up visits. She sets limits well, has a positive disposition with her younger children."

Mother asked for more visitation. The social worker told her "no additional visits were being recommended until she benefitted from services." The social worker wrote that they would have considered recommending mother for reunification services if she had "applied herself and could describe what abusive behavior looks like versus healthy behavior, if she left [boyfriend] [who] has abused her on and off since the start of her relationship and then abused her children, if she were remorseful over allowing [boyfriend] to abuse the children . . . ."

In a November 18, 2019, third addendum report, the social worker indicated she had no additional information regarding mother's participation in any services.[7] "The children deserve permanency and the mother previously received services for herself and the children while she was living with" boyfriend.

In a fourth addendum report filed January 14, 2020, the social worker reported that on November 24, 2019, the parents were involved in a domestic violence incident at boyfriend's residence for which boyfriend was arrested. On December 17, 2019, defendant pled no contest to misdemeanor battery on a cohabitant (Pen. Code, § 243, subd. (e)(1)) and was sentenced to 60 days in jail. A court issued a three-year criminal protective order prohibiting father from having contact with mother.

---

[7] However, although predating the prior report, attached to the report was a progress report for a parenting program dated September 10, 2019, which reflected that mother had attended 10 of 12 ordered sessions, had not missed any sessions, and her participation was deemed satisfactory.

10

Mother had eight visits with minor during the reporting period. Mother and minor bonded during visits. However, one supervising staff member noted that mother had difficulty setting limits for minor, such as offering to buy her dessert before eating her meal, giving her money, and giving her all of the toys she requested.

In a June 15, 2020, additional information to the court report, the social worker reported that boyfriend had committed suicide on May 22, 2020. After services for boyfriend, "the children were able to spend about [three] hours with their mother in a supervised setting that included lunch." The maternal aunt spoke with minor during the visit. Minor did not ask to visit with the maternal aunt. Minor was in custody at a juvenile facility for felony assault. The social worker recommended minor be placed with the maternal aunt in a planned permanent living arrangement with her sibling, H.H.

In an additional information to the court filed October 16, 2020, the social worker reported mother had completed individual therapy, a domestic violence class, and a parenting class. Mother's therapist requested that she reenroll for further sessions; however, mother failed to reenroll. A progress note from mother's parenting class noted that mother's comments did not indicate an understanding of the material; the instructor recommended that mother continue individual treatment; however, mother did not do so.

At a hearing on December 7, 2020, it appeared the parties had come to an agreement pursuant to which mother, as to minor, would not contest jurisdiction, and the department would recommend mother have six months of services, with four hours of

supervised visitations. However, after mother's reluctance to accept the offer, counsel for the department withdrew it.[8]

At the contested, combined jurisdiction and disposition hearing on March 1 and 2, 2021, mother testified that H.H. had made false allegations that boyfriend was choking people in the house. H.H. was a liar. Boyfriend never choked mother, nor did she ever say that he had. Mother did not believe boyfriend had physically abused any of the children.

Parents began locking H.H. in his room at night from 8:00 p.m. until the morning at the age of five to keep him from molesting minor. They had caught H.H. doing "stuff that was really mind-blowing and disturbing." "He was having intercourse with his sister and trying to convince her that they were going to get married and run away together." From the age of four "he was trying to insert his penis into her[.]" H.H. and minor "were acting out sexually inappropriately and also had aggressive, destructive behaviors." "They were smearing feces on the wall. They were eating their feces. They were destroying property and aggressive towards others."

H.H. slept on a mat with a blanket and pillow in his room with no electricity. H.H. did not have a bed for four months because he broke the frame; but he still had a mattress and box spring. He did not have any bathroom facilities in his room. He had broken all

---

[8] The long delay between the detention and jurisdiction hearings was due, in part, to repeated conflicts declared between mother and her counsels, which required continuances to allow newly appointed counsel to prepare for a contested jurisdictional hearing. At one point, counsel for the department objected to the repeated continuances: "I think this is, perhaps, the fifth attorney the mother has had . . . ." Additional continuances were due to COVID-19 protocols.

the lightbulbs in his room. The electricity had not been working in his room for at least a couple months. H.H. was always able to open his windows. He could not open his window. H.H. was allowed to bathe in the house daily.

They also locked minor in her room: "A couple times she had tried running away, and one of the times she had said that she was going to marry her brother, and they were going to live happily ever after. Another time she didn't really have a reason or rhyme. She just took off and went to my neighbor's house, and then from there, took off down the street . . . ." "Because she would sneak out of her room, and we had mountain lions, bears, and bob cats that lived up and surrounded us around our property, and it was extremely dangerous. Besides, I was worried about her getting picked up by a stranger." They would lock her in her room whenever she had an outburst or they had to separate the children.

There was no light, electricity, or lightbulbs in minor's room in April 2019. There was a mattress in her room. There was no carpeting in her room. There was no heat in either H.H. or minor's rooms. P.K. had a box spring, mattress, electricity, a lamp, and a nightstand in his room.

The children did not go to school when parents had doctors' appointments, which occurred "definitely more than twice a week."[9] H.H. had not gone to school for three weeks before being taken into protective custody. There were incidents of domestic

---

[9] Mother wore prosthetics below the knees of both her legs. Mother was paid as a caregiver for boyfriend and minor.

violence between parents, but not in front of the children; boyfriend was twice arrested for domestic violence.

Prior to the instant proceedings, service agencies evaluated and diagnosed H.H. and minor; agency personnel engaged with them in coaching, therapy, and counseling sessions at least three times weekly. They were placed on medications. At one point, both H.H. and minor had been sent to a group home. However, the services were terminated before they were complete; mother begged them not to close services.

After services were terminated, mother was unable to obtain the children's medications. She repeatedly requested help from county agencies.[10] Mother told service agencies that she was locking H.H. and minor in their rooms: "I felt [ ] they said we were doing the best we could, and keep doing what we were told. That's exactly what they were trying to tell me since that's what we were there to address was the locks on the doors." Parents were trying to have H.H. removed from their home due to his behavior.

Mother visited with minor in her group home two hours, once weekly. When asked if she had missed any visits, mother responded, "There was a time I was—they were getting switched around, and during those times, it made it really impossible to see her." Mother gathered activities in preparation for her visits with minor. Minor called her "'Mom.'" Minor was, "[v]ery happy" to see mother at visits. Mother loved her children "[w]ith [her] heart and soul."

---

[10] An acquaintance of mother testified that mother had reached out to the department numerous times for assistance.

Mother had engaged in several services, including parenting classes which "has given me a lot of—it has given me confidence, and I acquired a lot of skills to improve my relationship with my children." "I've learned to sit and be a good listener. I've learned to help them be able to work through whatever situations they have with them being able to be calm and not have their outbursts."

During mother's testimony, the court observed of her repeated insistence on answering questions not asked of her, "It makes it look like you're trying to hide something or tailor something. It affects your credibility whenever you do that. So you can—you're not going to do that anymore, and if you do it, you have to understand the effect it has on the trier of fact. That it calls my attention to something that maybe my attention wouldn't necessarily be—necessarily on. So that's at your own peril when you do that. I'm trying to explain to you, and all counsel, when a witness tries to do that, it is definitely a red flag as to credibility."

A social worker with the Department of Aging and Adult Services testified that his job consisted of assessing clients' physical and mental abilities and the areas in which they need help with their daily activities. Boyfriend and minor were his clients between 2016 and 2019. He visited parents' home twice a year. In 2018, minor's room "was bare. It had no carpet. It had a pillow and a blanket on the floor, which I was—it was reported to me was used to sleep on. The window was shut to where it could only open one inch, and that was done because she reportedly attempted to throw her mattress out of the window, so she couldn't escape." He made a referral to the department.

Minor had been removed in 2019 because it had been reported, "That she would physically harm herself, pulling out her hair. She would try to run away from the home. She would hit herself." It was reported minor had been sexually abused by her biological father.

After testimony, the court noted, "Mother certainly paints a different picture than what the reports say. And I don't believe the picture that she has painted. I think she is still either in denial or is being deceitful when she testifies about certain things or, at least, minimizing to a great extent. Certainly shifting blame." "I think that is part of how [mother] survives mentally, maybe, is to shift the guilt and blame to somebody else."

The court sustained the allegations pertaining to minor,[11] and removed her from mother's custody. "And for the [section] [361.5, subdivision] (b)6 bypass, I would agree with the Department's assertion that in this instance the several years of locking the children, especially in the state they were found in the day of removal, when they were left at least five hours alone, locked in a room before [father] and [mother] came home, you know, I think that is indicative of what was always happening." "And so I think that was definitely cruel to where the children had to soil themselves or scream to be allowed to go to the bathroom, not have access to food like was needed. In an emergency

---

[11] The court indicated that it had previously dismissed the allegations that minor's biological father had sexually abused her, and that mother failed to protect her from such abuse. However, there is nothing in the record to support that statement other than the court's statement itself. The minute order for the date the court made the statement reflects the court dismissed those allegations that day.

situation, had there been a fire or a flood, they would not have been able to get out of that situation."

"I believe the facts as presented by [H.H.], and I do believe he was choked out to the point of unconsciousness as stated. I believe all of the things that he has reported in those papers, over Mother's assertions. Mother's assertions, again, have been self-serving, and only at some point when she was forced to talk about [domestic violence] did she start to admit that." "I do not believe [boyfriend's] death removes Mother's risk to the children. Mother is clearly a risk to the children by her parenting styles and by allowing [boyfriend]—and, frankly, I think she was a part of it. So, you know, doing the locks and all of that, there's no doubt in my mind that this is severe physical abuse."

The court denied mother reunification services and set the section 366.26 hearing. The court set visitation as one hour monthly. The court authorized assessment of the maternal aunt pursuant to ICPC requirements.

In the August 24, 2021, status review report, the social worker recommended a "permanent plan of PPLA, with a fit and willing relative . . . ." The social worker noted that approval of the ICPC to place minor with the maternal aunt was still pending. Minor had had several placement changes. She was placed in her then current placement on August 6, 2021. Mother had visited via Zoom, once monthly, which minor reported went "really well." "During this reporting period [minor] remains hopeful that she will be placed with her maternal aunt as she has expressed often she would like to live with her maternal aunt in Arizona. She reports that she is excited with the idea[ ] of having the

17

opportunity to live like a regular teen with her aunt and cousin. She reports that her visits with her mother, [ ] are going well and she looks forward to visiting with her mother."

At the hearing on September 3, 2021, the court adopted the department's proposed findings and orders that minor's current placement and a permanent plan of placement with a relative was appropriate. On February 15, 2022, the court granted mother's counsel's motion to be relieved as counsel.

In the February 25, 2022, status review report, the social worker noted that the ICPC approval was still pending. Mother had continued to visit with minor once monthly on Zoom. Minor again reported "that her visits with her mother are going really well." "On July 4, 2021, [minor] had a visitation with her maternal aunt and cousin. On January 17, 2022, the mother . . . visited with the child [ ] at the placement." Minor remained "hopeful that she will be placed with her maternal aunt as she has expressed often she would like to live with her maternal aunt in Arizona. She reports that she is excited with the idea[ ] of having the opportunity to live like a regular teen with her aunt and cousin. She reports that her visits with her mother, [ ] are going well." The court found minor's placement appropriate and continued to grant authority to place minor with the maternal aunt once approved pursuant to the ICPC.

In a March 17, 2022, additional information for the court, the social worker reported that the maternal aunt had been approved for placement. Minor was removed from her placement and placed with the maternal aunt on March 12, 2022. The maternal aunt reported that minor was adjusting well to the home.

18

At the hearing on March 25, 2022, mother's counsel objected to the placement. Minor's counsel agreed to the placement. The court approved the placement with the maternal aunt. The court ordered supervised, in person visits once monthly for two hours in Arizona; the court also ordered additional telephone and video visits.

Mother's counsel filed an appeal on behalf of mother from the order placing minor with the maternal aunt. Mother's appellate counsel filed a brief pursuant to *In re Sade C.* (1996) 13 Cal.4th 952, raising no issues and requesting this court to independently review the record for error. This court dismissed the appeal as abandoned.

In a status review report filed on September 7, 2022, the social worker recommended the court set a section 366.26 hearing and order adoption as the permanent plan. In the maternal aunt's home, minor had "access to all other maternal relatives." Minor received phone calls from her brother, H.H. The maternal aunt reported minor was "doing very well" in the placement; she was attending school every day without incident.

Mother continued to visit with minor once monthly for two hours. The maternal aunt reported that mother continued to purchase minor whatever she wanted; minor would ask for things because she knew mother would buy them immediately. "Once they are received . . . [minor] places the things in a corner and doesn't use the items and it adds to [minor's] tendency to hoard." Mother would tell minor that mother intended to get custody of minor back; mother would also bring up the boyfriend whom she would represent as "a good guy." Minor had "no overwhelming reaction to saying hello or

19

goodbye to her mother. When it is time to end the visits, [minor] will get in the car and say let's go. [Mother] is the one [who] tries to prolong goodbyes after a visit."

Minor had been placed in 13 prior placements. Her "behaviors ranged from oppositional, defiant, cussing[,] and temper tantrums. Since she has been placed with her maternal aunt, . . . the majority of her behaviors have lessened." The maternal aunt was "committed to caring for [minor] to the level of adoption and wants to move forward with the process of adoption."

In an October 27, 2022, additional information for the court, the maternal aunt reported minor was "doing well in the home." Mother last visited with minor on October 7, 2022, at the county fair. The visit went "very well." However, the maternal aunt reported that mother continued to purchase items at minor's request which minor left unopened and unused in a corner of her room. One of minor's teachers reported that minor had "made amazing progress."

On November 7, 2022, mother filed a section 388 petition seeking to change the court's order of once monthly, two-hour, supervised visitation, to three times monthly, four-hour, unsupervised visitation.[12] Mother alleged as changed circumstances that she had consistently visited minor, minor had responded to mother positively, and minor enjoyed the time spent with mother during visits. Mother alleged the change would be in the best interest of minor because minor had communicated with mother with emojis

---

[12] In the alternative, mother requested increased "supervised visits to three times per month for up to four hours" or, increased "supervised visits to twice per month for up to four hours . . . ."

20

reading "'love you'" and "'miss you.'"  Mother also asserted the change would be in minor's best interest because minor was bonded with mother and would benefit from increased time with her.

At the hearing on November 8, 2022, mother's counsel indicated he "ha[d] an un[a]voidable conflict and a breakdown of attorney-client relationship, so I would ask the Court grant new counsel for the mother."  The court appointed new counsel for mother.

Counsel for the department asked, "the Court to dismiss the mother's [section] 388 [petition] as it does not meet even prima facie levels of proof."  The court responded, "Well, tell me why—because, I mean I looked at it . . . and I was looking at the best interest and all of that.  [¶]  Can you explain to me why it doesn't meet—it sounds like they're having positive visits, so if you can explain to me why it doesn't meet prima facie, which is a very low level?"

Counsel for the department responded, "At this point, your Honor, we are going to be going to a [section] [366].26 [hearing].  The mother is already getting extended visits, 5 to 6 hours, instead of 2, but I would note there really isn't [a] change of circumstances. The mother's behavior at this point does not meet the prima facie level for change of circumstances.  [¶]  As outlined in the [section] [366].26 report, she continues to try to pressure the minor to move back home.  She brings up the [boyfriend] in conversation stating he loves her and tries to bring up memories for the minor.  The minor has no reaction to the visits ending with the mother, even though the mother tries to prolong those goodbyes.  The mother continues to buy the minor whatever she wants despite the

21

concerns regarding the minor's hoarding tendencies. [¶] Ultimately, it doesn't meet best interest either as the child is doing very well in school. She has an IEP. She is attending therapy, and she is stabilizing. Any unsupervised visitation with the mother would be, in my opinion, a threat to the minor's stability and potentially her safety as well, given the mother's lack of boundaries and ability to be appropriate."

Mother's counsel argued, "I don't see any kind of detriment or any harm to the child, other than the gifts . . . but I think the[ ] [visits] are going well, and I think it is in the best interest of the child to have Mom spend more time. She does travel all the way to Arizona to make these happen, and she has been very consistent, even with that obstacle in the way, and the minor seems to be bonded with the mom. She misses her. She does enjoy being visited by her mom, and so that's why we're asking for more frequent visits or longer visits."

Minor's counsel objected to unsupervised visits noting, "minor is finally stabilizing in this case." "Mother's still making inappropriate statements to the child. And does she love her? I'm not objecting to that. I think she does, but I think we need to leave it as it is and let this minor continue to stabilize, and that's what would be in her best interest." The court noted it was "going to deny the prima facie [showing] for not [being] in the best interest on those grounds for all the reasons stated by County Counsel and Minor's counsel, over Mom's objection."

## II. DISCUSSION

Mother contends the court abused its discretion in denying her petition without holding an evidentiary hearing. We disagree.

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child." (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

"Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing." (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912; contra, *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158, fn. 5 [allowing argument on whether the mother had made a prima facie case in a § 388 petition "benefitted her by giving her the opportunity to establish a record supporting her request for an evidentiary hearing"].)

"The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstance or new evidence and that modification would promote the child's best interests. [Citations.] This is determined by the seriousness of

23

the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner. [Citation.] After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. [Citation.] 'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

Even if the juvenile court errs in failing to hold an evidentiary hearing on a section 388 petition, that error will be held harmless unless there is a reasonable probability that in the absence of the error a result more favorable to the petitioner would have been reached. (*In re J.P.*, *supra*, 229 Cal.App.4th at pp. 128-129 [harmless where juvenile court erroneously failed to hold a hearing on a § 388 petition]; *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1162 [erroneous denial of hearing on second § 388 petition harmless where hearing was granted on first petition and where petitioner failed to identify additional evidence she would present at hearing]; *In re Victoria C.* (2002) 100 Cal.App.4th 536, 544 [erroneous denial of hearing on § 388 petition harmless where juvenile court had considered evidence attached to petition in periodic review hearing].)

First, we disagree with mother that the juvenile court denied her a hearing on her petition. The court and counsel discussed the merits of mother's petition before the court denied it. Thus, the juvenile court permitted mother a de facto, if not a de jure, hearing on the merits of her petition.

Second, if mother wanted an evidentiary hearing on the petition, she should have objected to the court's ruling on it without one. Mother's counsel had ample opportunity at the hearing to request that mother testify or that she be permitted to produce additional evidence. Her failure to do so forfeited any error. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [a "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"], superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)

Third, mother failed to state a change in circumstances, let alone a substantial change in circumstances. The court did not previously reduce mother's visits for any of the reasons she proposed as changed circumstances; rather, the court reduced mother's visitation because it had denied her reunification services and, as such, it was appropriate to reduce visitation to stabilize minor in her placement. (*In re N.F.* (2021) 68 Cal.App.5th 112, 120-121 ["The change in circumstances supporting a section 388 petition must be material. [Citations.]"]; (*In re S.R.* (2009) 173 Cal.App.4th 864, 870 ["'The change[d] . . . circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate.'"].)

Fourth, there was evidence that increasing visitation was not in minor's best interest. Early on, after a visit with mother, minor refused visits with the maternal aunt. Minor had behavioral issues after some visits, including becoming "extremely aggressive." Mother had difficulty setting limits for minor, giving her everything she wanted. Mother communicated with minor inappropriately, telling her that mother intended to get custody of minor back and representing the boyfriend as "a good guy." Moreover, minor showed no real negative reaction to visits ending.

Fifth and finally, even if the court erred in failing to hold an evidentiary hearing on the petition, any error was harmless because "mother here wholly fails to identify additional evidence she would have presented at an evidentiary hearing that would have established" a change of circumstances and that increased visitation with her would have been in minor's best interest. (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1164.) The juvenile court acted within its discretion in denying the petition.

### III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                          Acting P. J.

We concur:

MILLER
                    J.

FIELDS
                    J.

26